**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Tom Horne, Arizona State Superintendent of Schools; Arizona State Department of Education,<br><br>            Plaintiff,<br><br>vs.<br><br>United States Department of Education, Arne Duncan, in his capacity as Secretary of the United States Department of Education,<br><br>            Defendant. | No. CV-08-1141-PHX-MHM<br><br>**ORDER** |

Currently pending before the Court is the United States' Renewed Motion to Dismiss Plaintiffs' Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. After reviewing the record and holding oral argument, the Court issues the following Order.

**I.    Statutory Background**

The Elementary and Secondary Education Act (ESEA) permits states to voluntarily participate in a federal-state partnership in the area of public education. In return for federal monies, participating states must agree to comply with federal requirements that are meant

to enhance the quality of elementary and secondary education and to further academic achievement. 20 U.S.C. § 6301, et. seg.

The No Child Left Behind Act amended the ESEA to "ensure that all children have a fair, equal and significant opportunity to obtain a high-quality education and reach, at a minimum, proficiency on challenging state academic achievement standards and state academic assessments." Id. As a means of holding states accountable for the federal funding they receive, NCLB requires states to make annual assessments of all public school students and to use the results of these assessments in determining whether schools and districts have made adequate yearly progress (AYP) towards the NCLB's overriding goal of academic proficiency for all students.

Title I of the ESEA, as amended by NCLB, contains several programs geared toward boosting the educational achievement of disadvantaged students. 20 U.S.C. § 6301(2). To receive a federal grant under Title I, Part A, a state must submit a plan, developed by the state educational agency, that demonstrates the following: (**1**) that the state has adopted challenging academic standards that will apply to all schools and children in the state, 20 U.S.C. § 6311(b)(1)(A)-(B); (**2**) that the state has implemented high-quality yearly academic assessments to measure students' performance in mathematics, reading or language arts, and science; and (**3**) that the state has developed a "single, statewide State accountability system" for holding local educational agencies and schools accountable for making AYP. Id. States are largely responsible for defining AYP, but the definition must "appl[y] the same high standards of academic achievement to all" public elementary and secondary school students must be based on statistically valid and reliable method of measuring student progress, and must include "separate measurable annual objectives for continuous and substantial improvement" for various groups of students, including one group comprised of all public elementary and secondary school students, as well as certain subgroups of students, including limited English proficient students ("LEP"). 20 U.S.C. § 6311(b)(2)(C). For a school or district to make AYP, both the "all students" group and the LEP subgroup, along with the other subgroups of students identified in § 6311(b)(2)(C)(v), must meet the academic

objectives set by the state. Id. § 6311(b)(2)(I)(i). Alternatively, if a given group does not meet its annual objective, a school or district can make AYP if the percentage of students in the group measured "below proficient" on the state assessments is at least 10 percent lower than it was in the preceding school year. Id.

In addition to directing that the academic achievement results of LEP students be included in AYP calculations, both as part of the group comprised of all students and as part of the LEP students subgroup, § 6311(b)(2)(C)(v)(I)(dd), NCLB further directs that LEP students "shall be assessed in a valid and reliable manner and provided reasonable accommodations on assessments . . . including, to the extent practicable, assessments in the language and form most likely to yield accurate data on what such students know and can do in academic content areas, until such students have achieved English language proficiency." § 6311(b)(3)(C)(ix)(III); see also 34 C.F.R. § 200.6(b). LEP students must be assessed with tests written in English once they have attended school in the United States for three or more consecutive years, unless an extension of time is warranted. 20 U.S.C. § 6311(b)(3)(C)(x); see also 34 C.F.R. § 200.6(b)(2)(i).

Under NCLB, schools that fail to make AYP for certain time periods may be identified, in increasing levels of severity, for "improvement," "corrective action," or even "restructuring." 20 U.S.C. § 6316(b)(1)-(8). Before identifying the aforementioned actions, the local educational agency must provide the school with the academic assessment date on which the identification is based. § 6316(b)(2)(A). The school may then appeal the identification to the local educational agency on the ground that the proposed identification "is in error for statistical or other substantive reasons." § 6316(b)(2)(B).

**II.  Legal Standard**

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir. 1990). The Ninth Circuit has stated that "[t]he issue is not whether a plaintiff's success on the merits is likely

but rather whether the claimant is entitled to proceed beyond the threshold in attempting to establish his claims." De La Cruz v. Tormey, 582 F.2d 45, 48 (9th Cir. 1978). The Court must determine whether or not it appears to a certainty under existing law that no relief can be granted under any set of facts that might be proved in support of plaintiffs' claims. Id.

Rule 12(b)(6) must be read in conjunction with Rule 8(a) which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure Section 1356 (1990). The notice pleading standard set forth in Rule 8 establishes "a powerful presumption against rejecting pleadings for failure to state a claim." Gilligan v. Jamco Dev. Corp., 108 F.3d 246, 249 (9th Cir. 1997). Therefore, a district court does not dismiss a complaint for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see also U.S. v. City of Redwood City, 640 F.2d 963, 966 (9th Cir. 1981).

## III. Procedural and Factual History

In 2003, the Arizona Department of Education ("ADE") engaged in negotiations with representatives from the United States Department of Education ("USDE") over the assessment of Arizona's large population of LEP students, who mostly spoke Spanish as a first language. The negotiations were primarily concerned with the effect that an Arizona state proposition, Proposition 203—approved by the voters in 2000—might have on the states newfound obligations under NCLB. See A.R.S. §§ 15-751-757. Proposition 203 requires that all children in Arizona public schools be taught in English and that "a standardized, nationally-normed written test of academic subject matter given in English . . . be administered at least once each year to all Arizona public schoolchildren." Id. According to the State of Arizona, Proposition 203 prohibits ADE from testing LEP students in their native languages for the period of time allowable under NCLB and its companion regulations. See 20 U.S.C. § 6311(b)(3)(C)(III)

According to the State of Arizona, representatives from both ADE and USDE entered into an oral agreement that would permit Arizona schools to include their LEP students'

- 4 -

scores as part of their AYP calculation, but any school failing to make AYP because of its LEP students' scores could appeal that classification under 20 U.S.C. § 6316(b)(2)(B). The basis for such an appeal would be that the score results of LEP students could not be a valid and reliable indicator of academic proficiency because language deficiencies, compounded by Proposition 203, would likely skew the results. Based on this alleged agreement, Arizona submitted its Consolidated State Application Accountability Workbook and agreed to participate in NCLB, thereby accepting federal educational monies.

In April 2005, a USDE monitoring team found that ADE was improperly allowing schools to use the appeals process of 20 U.S.C. § 6316(b)(2)(B) to effectively remove the assessment scores of LEP students from the determination of whether a school has made AYP. The team issued a report requiring ADE to cease this use of the appeals and to implement testing practices that minimize language barriers for LEP students during their first three years of English instruction..

In July 2006, ADE filed suit before another judge in the District of Arizona seeking a declaratory judgment that it had properly interpreted the appeals process under 20 U.S.C. § 6316(b)(2)(B) when it excluded LEP students' assessment scores from the state's AYP determinations under NCLB. The previous district court judge determined that the case lacked subject matter jurisdiction, since ADE was attempting to bring a pre-enforcement action against USDE. ADE was therefore instructed that before it could bring suit it must file a proposed amendment to Arizona's state accountability plan. That amendment would include ADE's preferred interpretation of the appeals process under 20 U.S.C. § 6316(b)(2)(B). Should USDE reject the state's amended plan, the Court noted that ADE could seek judicial review of such an action under the Administrative Procedures Act, 5 U.S.C. § 701, et. seq., for such action would constitute final agency action.

Thereafter, ADE sought to amend Arizona's state accountability plan to include "Element 9.2," which it characterized as an expression of the State of Arizona's statutory authority to determine appeals. This proposed plan amendment allowed "as grounds for appeal of an Arizona school's AYP determination, evidence that the school's failure to make

AYP is due to the inclusion of the non-proficient scores of limited English proficient (LEP) students who are in the first three years of enrollment in a school in the United States." ADE's apparent reasoning for the inclusion of Element 9.2 was that Proposition 203 placed an onerous burden on the public schools within Arizona—since state law dictates that all LEP students be tested once a year in English. According to ADE, Proposition 203 makes it almost impossible for schools within Arizona to provide "reasonable accommodation" to LEP students as permitted by the ESEA and NCLB, specifically 20 U.S.C. § 6311(b)(3)(C)(ix)(III). ADE further contends that because Arizona's LEP students are subject to yearly testing in English pursuant to Proposition 203, if public schools were required to include LEP test scores in their AYP determinations, the number of schools in Arizona that did not meet AYP would be dramatically over-represented, and an ever increasing number of Arizona public schools would be pegged for "improvement," "corrective action," or perhaps even, "restructuring."

The State of Arizona's proposed amendment, including Element 9.2, was rejected by the Secretary of Education on June 28, 2007. Specifically, the Secretary's decision stated that "[o]verturning a school's AYP determination based on the scores of LEP students who have not been in U.S. schools for at least three years . . . does not constitute 'statistical or other substantive reasons'" within the meaning of 20 U.S.C. § 6316(b)(2)(B). The Secretary indicated that ADE's proposal "conflicts directly with other provisions" of the ESEA, including the requirement of § 6311(b)(2)(C)(i) that the "same high standards of academic achievement" be applied "to all public . . . school students in the State," and the requirement of § 6311(b)(2)(C)(v)(II)(dd) that LEP students' achievement also be measured separately. The Secretary concluded that "[a]llowing Arizona to use the appeals process to exclude many, if not all, LEP students from AYP determinations simply because they have not been in U.S. schools for at least three years would effectively override the explicit statutory requirements that LEP students be included in AYP determinations and that schools be held accountable for their academic achievement." In other words, USDE determined that the inclusion of test scores of LEP students who have been in United States schools less than

three years could not constitute "error for statistical or other substantive reasons," which is the only permissible ground for a school's objection to an LEA's AYP determination pursuant to 20 U.S.C. § 6316(b)(2)(B).

After the Secretary rejected the proposed plan amendment, ADE requested an administrative hearing, citing 20 U.S.C. § 6311(e)(1)(E). The Secretary informed ADE on August 6, 2007 that hearings were not available for denials of plan amendments. On June 19, 2008, ADE filed the instant suit on June 19, 2008, which did not seek to review the denial of ADE's proposed plan amendment under the APA, but instead raised a breach of contract claim based on the oral contract that was allegedly made between USDE and ADE. On March 23, 2009, this Court dismissed ADE's Complaint. At the same time, the Court permitted ADE to file an Amended Complaint for the limited purposes of allowing ADE to challenge USDE's denial of its state plan amendment under the APA. On April 6, 2009, ADE lodged its Amended Complaint with the Court. On May 28, 2009, the United States again moved to dismiss the complaint.

### III. Legal Analysis

When reviewing an agency's determination based on statute, courts look first to whether "Congress has directly spoken to the precise question at issue . . . [and] give effect to the unambiguously expressed intent of Congress;" if unclear, then courts must consider "whether the agency's answer is based on a permissible construction of the statute." Chevron U.S.A. v. NRDC, 467 U.S. 837, 843–43 (1984). Under Chevron, if the "'traditional tools of statutory construction'" indicate that "'the intent of Congress is clear," then "'the court, as well as the agency, must give effect'" to that intent. Latino Issues Forum v. EPA, 558 F.3d 936, 941-42 (9th Cir. 2009). If "Congress has left a gap for the administrative agency to fill," Chevron "step two" requires that a court defer to the agency's interpretation unless it is "'arbitrary, capricious, or manifestly contrary to the statute.'" Id. Both Parties agree that the Chevron framework should guide the Court's analysis.

The primary statute at issue, § 6316(b)(2)(B), states that if the principal or a majority of parents of a school believe that the AYP label is in error for statistical or other substantive

reasons, "the principal may provide supporting evidence to the local educational agency, which shall consider that evidence before making a final determination." See 20 U.S.C. § 6316(b)(2)(B).

The United States argues that its denial of Arizona's plan amendment should be upheld under Chevron step one because Element 9.2 of the plan conflicts with the clear language of the ESEA. Specifically, the United States argues that the ESEA requires any state that receives a grant under its provisions to implement "yearly" academic assessments of "all students," 20 U.S.C. § 6311(b)(3)(A); to use those assessments to measure the yearly progress of each public school, id. § 6311(b)(2)(C)(iv); and to define AYP in a way that applies the same achievement standards to "all" students, including LEP students, id. § 6311(b)(2)(C)(i), (v)(II)(dd).

According to the United States, when viewed in its entirety, the statutory scheme enacted by Congress, did not intend for the appeals process of § 6316(b)(2)(B) to override the express, essential requirement that LEP students be included in assessments and AYP determinations so that schools are held accountable for the progress of these students. The United States contends that the determination of whether a school makes AYP, based on the assessment of all students, and the consequences that follow from a school's failure to do so, are the essential elements of the accountability mechanism that Congress has established. Thus, to the extent that ADE's proposed amendment would have allowed LEP students' test scores to be omitted from AYP determinations as "error" during their first three years in United States schools, it was properly rejected by the Secretary of Education based on the plain language of the statute.

Should the Court determine that 20 U.S.C. § 6316(b)(2)(B) is ambiguous, the United States next contends that the Secretary's interpretation should be upheld as reasonable under Chevron step two. See Norfolk Redev. & Hous. Auth. v. Chesapeake & Potomac Tel. Co., 464 U.S. 30, 36 (1983) (noting that statutes must be interpreted "in light of the purposes Congress sought to serve"); Chickasaw Nation v. United States, 534 U.S. 84, 85 (2001)(courts should avoid any interpretation that would "conflict with the intent embodied

in the statute Congress wrote"). Under the second step of the Chevron analysis, the United States claims that its denial of ADE's proposed plan amendment cannot be characterized as arbitrary, capricious, or manifestly contrary to the statute, since the Secretary's decision conformed with the broader goals and policies of the statute. As previously stated, Element 9.2 of Arizona's proposed plan amendment allowed "as grounds for appeal of an Arizona school's AYP determination, evidence that the school's failure to make AYP is due to the inclusion of the non-proficient scores of limited English proficient (LEP) students who are in the first three years of enrollment in a school in the United States." The United States argues that permitting this exception would have been inconsistent with Congress's goal of requiring accountability for the progress of all students, including members of the LEP student subgroup. According to the United States, Congress' expressly sought to identify LEP students as a group that must be included in AYP determinations both as a separate subgroup and within the "all students" group, which evinced a particular concern with ensuring that a state be held accountable for the academic progress of this population in order to prevent LEP students from slipping through the cracks. According to the United States, because Arizona's proposed plan amendment was contrary to these Congressional aims, the Secretary's decision was not improper, and at a minimum should be entitled to Chevron deference by the district court.

The State of Arizona responded to the United States' position by arguing that the Secretary's decision to reject its proposed plan amendment is not entitled to deference and should be stricken. While the State of Arizona acknowledges that courts as well as agencies must give effect to the unambiguously expressed intent of Congress, Chevron, 467 U.S. at 842-43, ADE disagrees with the federal government as to what the actual expressed intent of the statutes at issue is. § 6316(b)(2)(B) states that a school may appeal its AYP label for statistical or substantive reasons. According to ADE, under the plain language of the statute, based on the school's request, the "local educational agency" submits an appeal to the state, which makes the final determination based on the evidence presented. ADE argues that it was Congress' specific intent for the state and local districts to decide what reasons would be

sufficient for granting an appeal, not the Secretary of the USDE. ADE claims that by rejecting its proposed plan amendment, the Secretary has substituted his judgment for that of the states and concluded that ADE violated the accountability requirements of the statute without allowing it to provide any facts or evidence to support its assertion that granting appeals does not violate accountability requirements for LEP students. Furthermore, according ADE, the Secretary has prejudged Arizona's compliance in an area where the statutory language gives states discretion to determine appeals for substantive educational issues.

The State also argues that NCLB's other statutory provisions support the concept of showing deference to local choices in education policy. For example, one of the specific means to accomplish the Act's stated purpose is "providing greater decision making authority and flexibility to schools and teachers in exchange for greater responsibility for student performance." See 20 U.S.C. § 6301(7)

With respect to Chevron step one, in determining whether the statutory language is clear on its face, the Court notes that it is not sufficient to look only at the language of § 6316(b)(2)(B) without also looking at the overall manner in which that language is used within the statutory scheme as a whole. In light of the overall statutory scheme of the ESEA, it does not seem plausible that a participating state could determine that the participation of LEP students during the first three years are "in error for statistical or other substantive reasons" when other provision of the statute make clear that, despite the limited exemptions provided for LEP students, states must still maintain the necessary accountability regarding the academic progress of LEP students. Such accountability consists, among other things, of complying with the specific provisions that require that all students, including LEP students, be included in AYP determinations. See 20 U.S.C. § 6311(b)(2)(C)(i), (v)(I), (v)(II)(dd). No degree of flexibility that otherwise exists in the statutory framework authorizes a state to categorically exempt schools from these provisions whenever their failure to make AYP is due to the inclusion of LEP students in their first three years in United States schools. To the extent Arizona is unique due to its large LEP student population, as ADE points out in its

briefing, that fact only serves to underscore the importance of ensuring state accountability for the progress of these students.

While the appeals provision under 20 U.S.C. § 6316(b)(2)(B) does provide a certain amount of flexibility where a school principal or a majority of parents believe that a proposed identification of a school "is in error for statistical or other substantive reasons," those situations are clearly distinguishable to the categorical exemption that ADE's plan amendment sought to establish. For example, as the United States explained during oral argument, under § 6316(b)(2)(B) a state may allow a school to appeal its failure to make AYP if such failure is based on the inclusion of a student who has suffered a significant medical emergency that prevented the student from attending school and participating in the assessment.

As such, because the statutory language is plain on its face, and because the Secretary's decision to reject the State of Arizona's proposed plan amendment comports with the clear intent of Congress, the Secretary's decision is entitled to deference under step one of the Chevron doctrine.

However, in the alternative, even if the Court were required to proceed to Chevron step two, the Court finds that the Secretary's decision to deny Arizona's proposed plan amendment as being irreconcilable with the broad policy goals of ESEA was reasonable, and was not arbitrary, capricious, or manifestly contrary to the statute. Accordingly, the Secretary's decision is also entitled to deference under Chevron step two.

With respect to Chevron step two, in arguing that the Secretary's decision was arbitrary and in excess of statutory authority, ADE appears to focus on the flexibility that the statute grants to each state to appeal its failure to make AYP to the school district when the school principal or parents attribute that failure to "error for statistical or other substantive reasons." However, no part of the statutory scheme permits a participating state to override the express accountability requirements that are the linchpin of the ESEA. Although ADE has argued that its proposed plan amendment—in which ADE would not include LEP students as part of AYP calculations but would track and monitor LEP student progress using

alternative mechanisms—comports with Congressional objectives, what the State fails to recognize is that the accountability mechanisms of the ESEA and NCLB are not just general in nature; instead, the statute sets forth very specific ways in which a participating state must be held accountable for student achievement. The first requirement is that all students are subject to objective testing. 20 U.S.C. § 6311(b)(3)(C)(ix)(I); 34 C.F.R. § 200.6; Connecticut v. Spellings ("Conn. I"), 453 F. Supp. 2d 459, 470 (D. Conn. 2006). The second requirement is that all students, which would necessarily include LEP students, have their test scores included in a school's AYP calculations. 20 U.S.C. § 6311(b)(2)(I)(i); 34 C.F.R. § 200.20(a), (c). It should be noted that there is no exception that would permit a participating state such as the State of Arizona to broadly exempt all LEP students from assessment or reporting. In fact, the ESEA specifically directs that LEP students are to "be assessed in a valid and reliable manner and provided reasonable accommodations on assessments . . . including, to the extent practicable, assessments in the language and form most likely to yield accurate data on what such students know and can do in academic content areas, until such students have achieved English language proficiency." 20 U.S.C. § 6311(b)(3)(C)(ix)(III). Furthermore, although the Secretary has issued regulations permitting a state to exempt "recently arrived LEP students" from reading/language arts assessment and not to count the scores of such students on the mathematics assessment or the reading/language arts assessment (if they take it) in AYP determinations for one year, 34 C.F.R. §§ 200.6(b)(4), 200.20(f)(1)(ii), these one-time exemptions are limited to a small subset of LEP students –those who have attended schools in the United States for less than twelve months. Congress seemingly determined that this two-part method of accountability was the most practical way in which to make our nation's schools academically accountable to the federal government for federal funds. A state cannot come forward with a plan amendment that would more or less eliminate both of those requirements with respect to its LEP student population without blatantly running afoul of Congress' goals in passing the legislation.

1    In addition, contrary to the State's position, it is the Secretary, as head of the agency
2    charged with administering the relevant statute, who is authorized to make a final
3    determination regarding whether a state is in compliance with statutory requirements, as
4    indicated by the fact that ADE submitted its proposed plan amendment to the Secretary for
5    review. See 20 U.S.C. § 6311(f)(2); Conn. v. Spellings, 453 F. Supp. 2d 459, 469 (D. Conn.
6    2006) ("If a state's plan does not comply with the requirements of the Act, the Secretary is
7    empowered to decline to approve it, and is further authorized to impose penalties on
8    non-compliant states.").

9    Lastly, the ESEA only requires that each year LEP students are "assessed in a valid
10   and reliable manner and provided reasonable accommodations on assessments." 20 U.S.C.
11   § 6311(b)(3)(C)(ix)(III); see also 34 C.F.R. § 200.6(b). To the extent ADE claims that the
12   test scores of its LEP students during their first three years in state public schools should
13   qualify for a blanket exclusion as "error for statistical or other substantive reasons" merely
14   because those scores are unreliable in light of Proposition 203, the rejection of that
15   contention by the Secretary was not arbitrary, capricious, or manifestly contrary to the
16   statute. It is not altogether clear how Proposition 203, which has been codified at A.R.S.. §
17   15-755, effects any of ADE's obligations under ESEA and NCLB. The plain language of
18   § 15-755 simply requires the Arizona schools to administer a test in English once a year. See
19   A.R.S.. § 15-755 ("a standardized, nationally-normed written test of academic subject matter
20   given in English shall be administered at least once each year to all Arizona public
21   schoolchildren in grades two through twelve"). The statute does not appear to preclude ADE
22   from conducting additional testing for LEP students in their native languages, as permitted
23   under 20 U.S.C. § 6311(b)(3)(C)(ix)(III), or by providing reasonable accommodation to LEP
24   students unitizing other less obvious means. As both Parties recognized during oral
25   argument, the ESEA provides a great deal of flexibility for states to provide reasonable
26   accommodation to LEP students in a manner that is most sensible for each individual state.

27   Therefore, as an alternative argument, the Secretary's decision to deny the State of
28   Arizona's proposed plan amendment, including the inclusion of Element 9.2, is also entitled

to deference from this Court under <u>Chevron</u> step two, since the decision was not arbitrary, capricious, or manifestly contrary to the ESEA and NCLB.

## IV. CONCLUSION

There is no question that the State of Arizona is in a difficult position vis a vis its large LEP student base, especially in these difficult economic times. However, the Court's role here is quite limited. The only issue presented in this case is whether the United States Secretary of Education's decision to reject Arizona's proposed plan amendment survives judicial scrutiny under the deferential <u>Chevron</u> standard. After a careful review of the State's proposal to categorically exempt the test scores of its LEP students from AYP calculations, the Court cannot permit the Arizona to override the most basic requirements of the No Child Left Behind Act through its proposed plan amendment. As such, Arizona's administrative challenge to the U.S. Department of Education's decision fails.

**Accordingly,**

**IT IS HEREBY ORDERED** granting Defendants' Renewed Motion to Dismiss, (Dkt.#23).

**IT IS FURTHER ORDERED** directing the clerk to enter judgment accordingly.

DATED this 21st day of December, 2009.

_____
Mary H. Murguia
United States District Judge